

ATTORNEY FOR APPELLANT

Rosemary L. Borek
Stephenson Morow & Semler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Mickey J. Lee
Maurice Wutscher LLP
Indianapolis, Indiana

George W. Pendygraft
George W. Pendygraft, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| City of Lawrence Utilities Service Board, City of Lawrence, Indiana, and Mayor Dean Jessup, Individually and in His Official Capacity, *Appellants-Defendants,* v. Carlton E. Curry, *Appellee-Plaintiff* | June 8, 2016 Court of Appeals Case No. 49A02-1506-CT-699 Appeal from the Marion Superior Court The Honorable Timothy W. Oakes, Judge Trial Court Cause No. 49D02-1212-CT-48783 |

**Baker, Judge.**

[1] An Indiana statute clearly provides that a utility service board may terminate a superintendent for cause after providing an opportunity for a hearing. The question with which we are confronted is whether this is the exclusive manner in which a utility superintendent may be terminated. We find that it is not.

[2] The City of Lawrence (the City), the City of Lawrence Utilities Services Board (the USB), and Mayor Dean Jessup (collectively, the Government) appeal the trial court's order, which granted summary judgment in favor of Carlton Curry on Curry's wrongful discharge claim and denied the Government's summary judgment motion on Curry's claim for intentional interference with employment relationship. Curry cross-appeals, arguing that the trial court erroneously granted summary judgment in favor of the Government on his claim under the Wage Payment Statute.

[3] We find as follows: (1) the mayor had authority to terminate Curry's employment; (2) as such, Curry has no right to prevail on an intentional interference with employment relationship claim; and (3) Curry is not entitled to recover under the Wage Payment Statute. We reverse the judgment of the trial court with respect to the wrongful discharge and intentional interference with employment relationship claims and remand with instructions to enter summary judgment in the Government's favor on those two counts. We affirm the trial court's order with respect to the Wage Payment Statute count.

# Facts[1]

In May 2006, Lawrence voters passed a referendum authorizing the creation of the USB, which placed utility management under municipal control. The City Council then passed an ordinance creating the USB with an effective date of January 1, 2008. The ordinance provides that the USB consists of five members, three of whom are appointed by the mayor and two of whom are appointed by the council. The ordinance does not discuss the utility head position. At a March 12, 2008, USB meeting, the title of the utility head position was changed from "director of utilities" to "director/superintendent."[2] Appellants' App. p. 176, 190-92.

The USB requires mayoral approval to issue bonds, incur debts, or raise rates. Therefore, it is important for the mayor to be on board with USB's major policy initiatives. Utilities are financed through water and sewage usage fees and utility employees are paid through the City, though the USB has a budget that is separate from the City's general fund.

In 2009, then-Mayor of Lawrence Paul Ricketts approached Curry about becoming USB superintendent, and Curry agreed to take the position. At the August 12, 2009, USB meeting, Mayor Ricketts recommended Curry for the position, and—with no discussion—board members voted unanimously in

---

[1] We held oral argument in Indianapolis on April 27, 2016. We thank the attorneys for their able written and oral presentations.

[2] For simplicity's sake, we will refer to the position throughout as "superintendent."

favor of appointing Curry. During Curry's tenure, he worked closely with Mayor Ricketts regarding the direction of the USB and all major policy initiatives. One USB initiative that both Curry and Mayor Ricketts advocated for strongly was the construction of a wastewater treatment plant for Lawrence.

[7] In November 2011, Mayor Ricketts was defeated in the general election by Dean Jessup. Mayor-elect Jessup's transition team sent correspondence to all department heads, including Curry, inviting them to submit a resume and letter of interest if they wished to remain in their positions. Curry submitted a letter of interest and resume, met with the transition team's utility committee, and gave a presentation. Curry also communicated directly with Mayor-elect Jessup.

[8] Mayor-elect Jessup learned about the proposed wastewater treatment plant, which would cost approximately $150 to $200 million. Mayor-elect Jessup had concerns about the cost of the project and was not convinced that it was a good plan. Curry advocated strongly for the project, and Mayor-elect Jessup believed that if Curry was retained as USB superintendent, there would be frequent conflict if the mayor decided to forego the wastewater treatment plant project. Mayor-elect Jessup wanted a USB superintendent who would implement his goals and objectives and give balanced advice rather than advance his own point of view.

[9] When Mayor Jessup took office on January 1, 2012, he asked for the resignations of all mayoral appointees on every city board. The three mayoral

appointments on the USB complied and were replaced with Mayor Jessup's appointees. Curry continued to advocate strongly for the wastewater treatment plant. Mayor Jessup felt that he was being given a sales pitch, and his concerns about his working relationship with Curry increased. Mayor Jessup decided to replace Curry with John Solenberg. Curry was notified by letter and in person on January 19, 2012, that his employment would end on January 20. Mayor Jessup submitted a recommendation for Solenberg as the new USB superintendent, and the USB approved Solenberg unanimously.

[10] On December 21, 2012, Curry filed a complaint against the Government, asserting both federal and state law claims. The case was removed to federal court; on March 3, 2014, the district court granted summary judgment in favor of the Government on all of Curry's federal claims and remanded the case to state court for consideration of Curry's remaining claims based in state law. The remaining claims are as follows: Count I, Wrongful Discharge; Count III, Defamation; Count IV, Intentional Interference with Employment Relationship; and Count V, Wage Payment Statute Claim.

[11] On October 22, 2014, Curry filed a motion for partial summary judgment on Count I, and on November 25, 2014, the Government filed a motion for summary judgment on all counts. Following briefing and a hearing, on April 6, 2015, the trial court granted summary judgment in favor of Curry on Count I (wrongful discharge), granted summary judgment in favor of the Government on Counts III (defamation) and V (Wage Payment Statute), and denied summary judgment on Count IV (intentional interference). The Government

now brings this interlocutory appeal of the trial court's order with respect to the wrongful discharge and intentional interference claims, and Curry cross-appeals with respect to the Wage Payment Statute claim.

# Discussion and Decision

## I.  Standard of Review

[12]  Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)).  "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences."  *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).  We apply a de novo standard of review to questions of statutory interpretation.  *E.g.*, *State v. Int'l Bus. Machs. Corp.*, 964 N.E.2d 206, 209 (Ind. 2012).

## II.  Government's Appeal

[13]  The Government argues that the trial court erred by granting summary judgment in Curry's favor on the wrongful discharge claim and by denying

summary judgment on the intentional interference with employment relationship claim.

# A. Wrongful Discharge

[14] Curry's wrongful discharge claim relies on Indiana Code section 8-1.5-3-5, which applies to municipal utility superintendents. Section 5(d) provides that "[t]he superintendent may be removed by the board for cause at any time after notice and a hearing." It is undisputed that Curry was not removed for cause and did not receive notice or a hearing.

[15] We begin our analysis by focusing on the plain language of the statute. While section 5(d) provides that the superintendent "may" be removed by the board for cause, it does not say "may *only*" be removed in that fashion. It is well established that we will not add something to a statute that the legislature has omitted. *E.g.*, *Gresham v. State*, 414 N.E.2d 313, 314-15 (Ind. 1980). The clear implication of our General Assembly's decision to omit the word "only" from section 5(d) is that this method of employment termination is not the sole way in which the superintendent may be terminated. Instead, the statute plainly provides that if the USB intends to seek termination of the superintendent for cause, the superintendent is entitled to notice and a hearing before the termination is complete. The statute is silent as to termination without cause. We infer from the legislature's silence that the authority to terminate a superintendent without cause is not vested solely in the USB; similarly, we infer

that the superintendent is not entitled to notice or a hearing when he is terminated without cause.

[16] This interpretation of section 5(d) has to be correct to avoid an absurd result. If we were to find that a utility superintendent may only be terminated for cause, then the position would essentially be a lifetime appointment akin to a federal judge who retains her seat for life unless she commits an impeachable offense. We do not believe that the General Assembly intended to vest such robust job security in the position of utility superintendent.

[17] Furthermore, we agree with the Government that the political ramifications of a lifetime utility superintendent would be untenable:

> Jessup won the election, defeating Ricketts. The election of a new mayor reflected a desire for a change of city leadership. To implement that change, Jessup asked mayoral appointees on city boards including the USB for their resignations which resulted in three new mayoral appointees to that board. Forcing Jessup to accept the utility head chosen by Ricketts would limit his ability (and that of the newly constituted USB) to make changes without having to contend with a superintendent who is politically hostile or who does not share or even obstructs the policy objectives of the new leaders.

Appellants' Br. p. 13-14. We do not believe that the legislature intended that newly elected mayors are required to retain the utility superintendent appointed by their predecessors. It necessarily follows that the Mayor has the authority to terminate the USB superintendent.

[18] In our view, one possible purpose of section 5(d) is to act as a check on the mayor. If, for example, the mayor's brother was serving as USB superintendent and the mayor refused to fire his brother after the brother committed malfeasance, the USB would have the ability to terminate the mayor's brother for cause. This check on the mayor, however, does not remove the mayor's authority to terminate the superintendent because, as noted above, the statute is not worded as such.

[19] At oral argument, counsel for Curry suggested that the applicable Lawrence ordinance requires a conclusion that the USB had sole authority to hire and fire its superintendent. We disagree. The ordinance at issue provides, in relevant part, that "[t]he Council now transfers exclusive control of the City's municipally-owned water utility and sewer utility from the Board of Public Works and Safety to the Utility Board." Lawrence Ordinance § 1-1-3-13(B). In other words, this ordinance merely changes control of the utility to the USB from the Board of Public Works and Safety. In no way does this ordinance limit the mayor's authority; in fact, it explicitly vests in the mayor the power to appoint three of five members on the USB. The ordinance is silent as to the superintendent. We do not find that this ordinance curtails the mayor's authority to terminate the USB superintendent.

[20] Even if we were to accept the argument that the mayor does not have the authority to terminate the USB superintendent, our result would be the same. The above analysis regarding section 5(d) still stands, meaning that even if the USB has the sole authority to terminate its superintendent, it retains the right to

terminate the superintendent without cause. In this case, the USB did so by implication. The Mayor took action by terminating Curry and nominating his replacement; the USB acquiesced in that action by unanimously appointing the Mayor's suggested replacement. In other words, the USB exercised its oversight. The mere fact that the USB did not explicitly terminate Curry's employment cannot be enough to support a wrongful discharge claim. It would elevate form over substance to an untenable degree.

[21] We were able to find only two cases interpreting section 5(d), and do not find that either case changes our analysis. In *Morrison v. McMahon*, 475 N.E.2d 1174 (Ind. Ct. App. 1985), the utility board both hired and fired the superintendent pursuant to a former version of the statute. In response to the defendants' arguments concerning the mayor's authority to terminate the superintendent at will, the Court noted that the mayor was not involved in the firing in that case, so the statute was inapplicable. *Id.* at 1179-80. While the *Morrison* Court went on to examine the language of section 5(d), its analysis is pure dicta given that it held that the statute was inapplicable. And in *Phillips v. City of Bloomington*, this Court held that section 5(d) did not apply to Phillips, whose title was "director of utilities," because he had administrative responsibilities for the utility department beyond the statutory duties of a superintendent. 869 N.E.2d 1282, 1282-24 (Ind. Ct. App. 2007). Therefore, the *Phillips* holding does not apply to the instant case, in which we find that section 5(d) applies.

[22] In the end, the plain language of the statute must prevail. The statute does not state or imply that the exclusive method of termination is by the Board, for

cause, with notice and a hearing. Here, the Mayor retained the right to terminate Curry, but even if he did not, the USB exercised its oversight and acceded to his recommendations. We believe that this course of events was authorized by section 5(d) and do not believe that Curry has a claim for wrongful discharge. Therefore, we reverse and remand with instructions to enter summary judgment in favor of the Government on this count.

## B. Intentional Interference

[23] Next, the Government argues that the trial court erred by denying its motion for summary judgment on Curry's claim for intentional interference with his employment relationship. The trial court found that "[t]here exists a genuine issue of material fact as to whether Defendants intentionally and without a legitimate business purpose interfered with Curry's employment relationship." Appellants' App. p. 454.

[24] Any "intentional, unjustified interference with [an employment] contract by third parties is actionable." *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n*, 571 N.E.2d 282, 285 (Ind. 1991). The claimant, in addition to demonstrating the standard elements of the tort, must establish "that the defendant interferer acted intentionally and without a legitimate business purpose." *Id.*

[25] We have already found above either that (1) the Mayor had the authority to terminate Curry; or (2) the Mayor did not have the authority to terminate Curry, but the USB exercised its oversight and agreed with the Mayor's recommendation. If the Mayor had the authority to terminate Curry, then his

decision to do so cannot have been tortious. And even if the Mayor did not have authority to terminate Curry, he certainly had the authority to recommend that the USB terminate Curry and appoint a different individual. Under no set of circumstances or analyses could the Government's actions in this case have risen to a tortious level. Therefore, we reverse and remand with instructions to enter summary judgment in the Government's favor on this count.

## III. Curry's Cross-Appeal: Wage Payment Statute

[26] Curry cross-appeals, arguing that the trial court improperly granted summary judgment in favor of the Government on his claim under the Wage Payment Statute. The trial court held as follows: "While the Court did appreciate listening to the unique interpretation of this statute by Plaintiff's counsel, this type of action is clearly not what the statute encompasses, nor does the Court find that Plaintiff met any of the prerequisites for recovery under that statute." Appellants' App. p. 454.

[27] In relevant part, the Wage Payment Statute provides as follows:

> (a) Every person, firm, corporation . . . , doing business in Indiana, shall pay each employee at least semimonthly or biweekly, if requested, the amount due the employee. . . .

> (b) Payment shall be made for all wages earned to a date not more than ten (10) business days prior to the date of payment. . . . However, if an employee voluntarily leaves employment . . . , the employer shall not be required to pay the employee an amount due the employee until the

next and usual regular day for payment of wages, as established by the employer. . . .

Ind. Code § 22-2-5-1. Indiana Code section 22-2-5-2 provides that any employer who fails to comply with the foregoing statute owes liquidated damages to the employee totaling 10% of the amount due to the employee per day it is unpaid.

[28] To support his argument, Curry must take the position that he has never been effectively discharged from employment. According to Curry, his termination was a nullity. In other words, he contends he has remained superintendent of USB throughout all of these proceedings, and is owed wages and liquidated damages for each day he has been unpaid since January 2012.

[29] We cannot support this unique interpretation of the Wage Payment Statute. The purpose of the statute—to prevent employers from profiting from their employees' labor without timely payment—is plainly not implicated in this case. Whether or not Curry was "effectively discharged," it is undisputed that he has not, in fact, been working since the termination. His employer has not been profiting from his labor without timely payment. Indeed, were Curry to recover under this statute, he would receive an undeserved windfall for work that he has not performed. We agree with the trial court that summary judgment in favor of the Government on this count is proper.

[30] The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to enter summary judgment in favor of the

Government on Curry's claims for wrongful discharge and intentional interference.

May, J., concurs, and Brown, J., concurs in part and dissents in part with separate opinion.

City of Lawrence Utilities
Service Board, City of Lawrence,
Indiana, and Mayor Dean
Jessup, Individually and in His
Official Capacity,

*Appellants-Defendants*,

v.

Carlton E. Curry,

*Appellee-Plaintiff*.

Court of Appeals Case No.
49A02-1506-CT-699

**Brown, Judge, concurring in part and dissenting in part.**

I concur with the majority's handling of Curry's cross-appeal issue regarding his claim under the Wage Payment Statute, but I respectfully dissent from the majority's conclusions to reverse the trial court's decision to grant summary judgment in favor of Curry regarding his wrongful discharge claim and to deny the Government's summary judgment claim on Curry's intentional interference with employment relationship claim.

[32] This Court has previously examined Ind. Code § 8-1.5-3-5(d) in *Morrison v. McMahon*, 475 N.E.2d 1174 (Ind. Ct. App. 1985), *reh'g denied*, *trans. denied*. In *Morrison*, the Court examined that statute, as well as its predecessors, and ruled that "it is clear from the statutory history . . . existing essentially unchanged from 1913 . . . that the utility service board alone, not the mayor, has the specific power to discharge the superintendent." 475 N.E.2d at 1181. It found that "[t]he legislature intended that the mayor have the power to appoint the superintendent, subject to the board's approval . . . but the power to discharge the superintendent is vested solely in the board," and that Ind. Code § 8-1.5-3-5 "does not confer the power to terminate the superintendent on the mayor." *Id.* The Court concluded that "[t]hrough scrutiny of the repeated reenactments of the language of Section 8-1-2-100,[3] it is clear the legislature never intended that the mayor have plenary powers over the utilities. Such powers, i.e., the supervision, compensation, and removal of the supervisor, were placed in the board." *Id.* I agree with the analysis in *Morrison*.

[33] To the extent the majority opines that this interpretation leads to an absurd result in that the appointment of a utility superintendent "would essentially be a lifetime appointment akin to a federal judge . . . unless she commits an impeachable offense," I disagree. *Infra* at 8. The Government makes a similar claim in its brief, suggesting that "[f]orcing Jessup to accept the utility head

---

[3] Ind. Code § 8-1-2-100 is the predecessor statute and was repealed on the same date that Ind. Code § 8-1.5-3-1 *et seq.* became effective. *Morrison*, 475 N.E.2d at 1181.

chosen by Ricketts would limit his ability . . . to make changes without having to contend with a superintendent who is politically hostile or who does not share or even obstructs the policy objectives of the new leaders." Appellants' Brief at 14. However, I believe that in such a scenario, the USB would be able to remove the superintendent for cause pursuant to Ind. Code § 8-1.5-3-5(d), and that the majority interprets the "for cause" language in the statute too narrowly, limiting its scope solely to impeachable offenses.

[34] The majority also opines that one possible purpose of Ind. Code § 8-1.5-3-5(d) is to act as a check on the mayor. I am not persuaded by this interpretation, particularly in recognition of the fact that, under Ind. Code § 8-1.5-3-3, the mayor appoints a majority of the board members. The statutory scheme contained in Chapter 3 can be interpreted as creating a board to assist the mayor in implementing his or her agenda related to municipal utilities, and, again, a politically hostile superintendent would, in my estimation, be grounds for removal for cause. It also vests the authority to remove the superintendent in the board.

[35] I also respectfully dissent from the majority's decision to reverse the denial of the Government's motion for summary judgment on Curry's claim for intentional interference with his employment relationship because the applicable economic realities test involves determinations of fact which are inappropriate for summary judgment.

[36] I would affirm the trial court in all respects.